UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                    Case No. 10-68295

COLUMBA MAURA,                            Chapter 7
and
LISA MAURA,                               Judge Thomas J. Tucker

            Debtors.
_____/

**OPINION REGARDING THE**
**UNITED STATES TRUSTEE'S MOTION TO DISMISS**

The United States Trustee (the "UST") filed a motion to dismiss this Chapter 7 case, on

the ground that the case is an "abuse" of Chapter 7, within the meaning of 11 U.S.C.

§ 707(b)(1).[1] To demonstrate such abuse, the UST relies on the "presumption of abuse"

provisions of 11 U.S.C. § 707(b)(2); and alternatively, points to the totality of the Debtors'

financial circumstances under 11 U.S.C. § 707(b)(3). The Debtors, Columbo and Lisa Maura,

deny that their Chapter 7 case is an abuse, and oppose the Motion.

The Court held several hearings, including an evidentiary hearing. For the reasons stated

in this opinion, the Court will grant the motion, based on the presumption of abuse in

§ 707(b)(2)(A)(i), and the Debtors' failure to rebut that presumption under § 707(b)(2)(B).

**I. Jurisdiction**

This Court has subject matter jurisdiction over this bankruptcy case and this contested

matter under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.).

This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (O).

This proceeding also is "core" because it falls within the definition of a proceeding

---

[1] "Motion to Dismiss Chapter 7 Case Under 11 U.S.C. § 707(b)(2) and (3)" (Docket # 36, the
"Motion").

"arising under title 11" and of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within either of these categories in § 1334(b) are deemed to be core proceedings. *See Allard v. Coenen* (*In re Trans-Industries, Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009). This is a proceeding "arising under title 11" because it is "created or determined by a statutory provision of title 11," *see id.*, namely Bankruptcy Code § 707(b). And this is a proceeding "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *See id.*

## II. Background

The Debtors in this Chapter 7 case, Columbo Maura and Lisa Maura, are husband and wife, and have been married for over 20 years. Columbo Maura works as a salesman for Lipari Foods, Inc. Lisa Maura works as a nurse at Providence Hospital. According to their most recent amended Schedule I, Columbo Maura has an average gross monthly income of $5,965.00, and Lisa Maura has an average gross monthly income of $5,579.00.[2] These numbers mean that the Debtors have an annual combined gross income of $138,528.00.

The Debtors have three children. At the time of the evidentiary hearing, the children were ages 19, 16, and 14. The Debtors are Catholic, and the Debtors' children have always attended Catholic elementary school and Catholic high school. As a result of this, the Debtors have paid substantial tuition for their children over the years. At the time of the evidentiary hearing, the 16 year old was attending a Catholic high school, and the 14 year old was in Catholic grade school and due to begin at Catholic high school the following year.[3]

---

[2] *See* Debtors' Exhibit E (Docket # 59) at pdf p.13, line 1 (amended Schedule I). In this opinion, the Court will cite the exhibits admitted into evidence at the evidentiary hearing using the following form: DX-__ for the Debtors' exhibits; and UST-__ for the United States Trustee's exhibits.

[3] The foregoing facts are undisputed, and they are established by the testimony of Lisa Maura. Tr. (Docket # 85) at 26-27, 29, 30-32, and by the testimony of Columbo Maura. *Id.* at 84-85.

## III. Discussion

Section 707(b)(1) allows a United States Trustee, a trustee, a party in interest, or the court on its own motion, to seek dismissal of a consumer Chapter 7 case, for "abuse." It provides, in pertinent part:

> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, **if it finds that the granting of relief would be an abuse of the provisions of this chapter.**

11 U.S.C. § 707(b)(1)(emphasis added). In this case, the parties agree that the Debtors' debts are "primarily consumer debts."[4] "Abuse of the provisions of" Chapter 7, within the meaning of § 707(b)(1), can be shown in two alternative ways. The first of these is based on an unrebutted presumption of abuse under § 707(b)(2). If the presumption of abuse does not arise under § 707(b)(2) or is rebutted, the Court must consider whether abuse is established under § 707(b)(3), by determining "whether the debtor filed the petition in bad faith" or whether "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3).

The UST argues that abuse is shown in this case based on both § 707(b)(2) and § 707(b)(3). The Court will begin by considering the presumption of abuse under § 707(b)(2).

### A. Section 707(b)(2) and the presumption of abuse

### 1. General principles

Under § 707(b)(2)(A)(i), whether a presumption of abuse arises depends on the results of

---

[4] Motion (Docket # 36) at ¶ 4; Debtors' Response to Motion (Docket # 37) at ¶ 4.

a complex formula commonly referred to as "the means test." The means test and the provisions

now in § 707(b)(2) were added by the 2005 amendments to the Bankruptcy Code, known as the

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").

The Supreme Court recently described the means test this way:

> 'Congress enacted the Bankruptcy Abuse Prevention and
> Consumer Protection Act of 2005 . . . to correct perceived abuses
> of the bankruptcy system.' *Milavetz, Gallop & Milavetz, P.A. v.
> United States*, 559 U.S. —, —, 130 S.Ct. 1324, 1329, 176 L.Ed.2d
> 79 (2010). In particular, Congress adopted the means test — "[t]he
> heart of [BAPCPA's] consumer bankruptcy reforms," H.R.Rep.
> No. 109–31, pt. 1, p. 2 (2005), . . . — to help ensure that debtors
> who *can* pay creditors *do* pay them. See, *e.g., ibid.* (under
> BAPCPA, "debtors [will] repay creditors the maximum they can
> afford").

*Ransom v. FIA Card Servs., N.A.*, 131 S. Ct. 716, 721 (2011)(italics in original). In Chapter 7

cases, the means test is "used as a screening mechanism to determine whether a Chapter 7

proceeding is appropriate." *Id.* at 722 n.1.

The Sixth Circuit has described the means test and the calculations to determine whether

the presumption of abuse arises:

> In 2005, the landscape for bankruptcy filings dramatically
> changed. Responding to a growing belief that "bankruptcy relief
> may be too readily available and is sometimes used as a first resort,
> rather than a last resort," H.R. REP. NO. 109–31(I), at 4 (2005),
> and the prevalence of "opportunistic personal filings and abuse,"
> *id.* at 5, Congress enacted the BAPCPA in order to require above-
> median income debtors to make more funds available for the
> payment of unsecured creditors. As a result, higher-income
> debtors with the ability to repay a substantial portion of their debts
> without significant hardship are now required to do so by filing
> under Chapter 13 rather than Chapter 7.

> The centerpiece of the Act is the imposition of a "means
> test" for Chapter 7 filers, which requires would-be debtors to
> demonstrate financial eligibility to avoid the presumption that their
> bankruptcy filing is an abuse of the bankruptcy proceedings. By its
> terms, the BAPCPA authorizes a bankruptcy court to dismiss a

4

debtor's petition filed under Chapter 7 or, with the debtor's consent, to convert such a petition to Chapter 13 "if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. § 707(b)(1).  Under this test, the first step instructs the bankruptcy court to compare the debtor's annualized current monthly income to the median family income of a similarly sized family in the debtor's state of residence. If the debtor's current monthly income is equal to or below the median, then the presumption of abuse does not arise. 11 U.S.C. § 707(b)(7).  If, however, it exceeds the median, the Act directs the court to recalculate the debtor's income by deducting certain necessary expenses specified by the statute. *Id.* § 707(b)(2)(A)(ii). These reductions are derived from the national and local standards contained in the Internal Revenue Service's Financial Analysis Handbook. *Id.; see* INTERNAL REVENUE SERV., INTERNAL REVENUE MANUAL, FINANCIAL ANALYSIS HANDBOOK ("IRS Handbook"), *available* at http://www.irs.gov/ irm/part5/ch15s01.html.

> Because of these deductions, eligibility under the new regime is calculated at least in part based on the state and county where the debtor resides. The housing expense deduction, for example, is governed by the county where the debtor resides. *Id.* § 5.15.1.7(4)(A). [Footnote 2: The BAPCPA also permits a debtor to deduct additional expenses for food, clothing, housing, utilities, health insurance, disability insurance, health savings accounts, and certain educational expenses, so as long as the debtor demonstrates that those additional allowances are reasonable and necessary. 11 U.S.C. § 707(b)(2)(A)(ii).]  Although the national standards, which identify amounts for "food, housekeeping supplies, apparel and services, and personal care products and services," and a fixed "miscellaneous" amount, *id.* § 5.15.1.7(3), are mostly uniform throughout the United States, the local standards, which define amounts for housing and transportation, vary greatly.  If after deducting these necessary expenses and specified amounts, the debtor's current monthly income exceeds certain mathematical benchmarks, then the presumption of abuse arises. 11 U.S.C. § 707(b)(2)(A)(i).

*Schultz v. United States*, 529 F.3d 343, 347 (6th Cir. 2008).

If the result of the means test is that the presumption of abuse arises, the debtor may

attempt to rebut that presumption, but only under the detailed rules set forth in § 707(b)(2)(B).

To summarize these statutory provisions, a debtor may only rebut the presumption of abuse by

establishing, under oath and with "a detailed explanation" and supporting documentation, all of the following:

- that there are "special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances that justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative;"

  and

- that such "additional expenses or adjustments to income," when applied to the debtor's means test numbers, changes the end result of the means test to a level at which the presumption of abuse no longer arises.

*See* 11 U.S.C. § 707(b)(2)(B)(i)-(iv).

### 2. Application of the means test in this case

### a. Debtors' means test numbers

In this case, the Debtors admit that the presumption of abuse arises under § 707(b)(2), but they contend that they have rebutted that presumption. The UST disputes the numbers entered by the Debtors on several lines of their means test form, and disputes that Debtors have rebutted the presumption of abuse. The Court will discuss the points of dispute, one by one.

In this case, the Debtors initially filed their means test form, Official Form 22A, and then amended that form once, before the UST filed his Motion.[5] After the Motion was filed, Debtors amended their means test form three more times.[6] The Debtors filed their last amended means test form shortly before the Court held the evidentiary hearing, and that is the form the Court will discuss in this opinion, and use in deciding the Motion.[7]

The Debtors' means test form shows a total "Current Monthly Income for [purposes of

---

[5] Docket ## 12, 33.

[6] Docket ## 42, 48, 60.

[7] Docket # 60.

the] § 707(b)(7)" exclusion (the "initial CMI"), on line 12, of $11,545.39. This is comprised of

an initial CMI for Columbo Maura of $5,965.50 plus an initial CMI for Lisa Maura of

$5,579.89.[8] The Debtors' total initial CMI, on annual basis, equals $138,544.68.[9] This is well

above the median family income for Michigan, for a family of 5, of $82,058.00. As a result, the

exclusion of § 707(b)(7) does not apply,[10] and the Debtors had to complete the rest of the means

test form, namely, Parts IV ("Calculation of Current Monthly Income for § 707(b)(2)"); V

("Calculation of Deductions from Income"), VI ("Determination of § 707(b)(2) Presumption");

and VII ("Additional Expense Claims").

In Part V of the means test form, lines 19A through 47, the Debtors listed numerous items

of monthly expenses, totaling $11,243.76. Subtracting that monthly expense total from Debtors'

monthly initial CMI ($11,545.39), left a positive balance of $301.63 per month. This number

appears on line 50, and is called the "[m]onthly disposable income under § 707(b)(2)" (referred

to below as the "line 50 amount"). When multiplied by 60, that amount equals $18,097.80 (line

51). Because that number exceeds $11,725.00, the presumption of abuse arises under

§ 707(b)(2) (*see* lines 51, 52).

Debtors' means test form acknowledged that the presumption of abuse arises, but Debtors

attempted to rebut that presumption by pointing to an additional monthly expense that they listed

in Part VII of the means test form, labeled "Additional Expense Claims." In that Part VII, on line

56, which is labeled "Other Expenses," Debtors listed an expense for "Catholic School for

Children" in the amount of $900.00 per month. Debtors argue that because of this expense, they

---

[8]  *Id.* at 2-3, lines 11, 12.

[9]  *Id.* at 3, lines 13, 14.

[10]  Under § 707(b)(7), essentially, if the Debtors' initial CMI on an annualized basis were less than the applicable median family income, no motion to dismiss under § 707(b)(2) could be filed.

have rebutted the § 707(b)(2) presumption of abuse.

In order to rebut the presumption, Debtors must demonstrate that their claimed additional monthly expense is of the type that may be considered under the "special circumstances" provision in § 707(b)(2)(B)(i); and if so, that when the additional expense amount is subtracted from Debtors' line 50 amount, it changes that amount to a level at which the presumption of abuse no longer arises. *See* 11 U.S.C. § 707(b)(2)(B)(i)-(iv).

As applied to the numbers on Debtors' means test form in this case, this means that Debtors must show a "special circumstances" expense that when subtracted from Debtors' line 50 amount of $301.63, results in a monthly number of $195.41 or less. (The latter number is derived by dividing $11,725.00 by 60). *See* 11 U.S.C. §§ 707(b)(2)(A)(i)(II), 707(b)(2)(B) (iv)(II). If Debtors fail to prove this, then they have failed to rebut the presumption of abuse under § 707(b)(2).

If Debtors *do* prove this, then a further calculation may be needed before they can be found to have rebutted the presumption. Line 55 of the means test form refers to this as the "[s]econdary presumption determination."[11] That further calculation would be needed here only if the Debtors' line 50 amount, after subtracting any qualifying "special circumstances" expense, is greater than $117.08 per month (and, of course, equal to or less than $195.41 per month.) (The $117.08 per month number is derived by dividing $7,025.00 by 60. *See* 11 U.S.C. §§ 707(b) (2)(A)(i)(I), 707(b)(2)(B)(iv)(I)). If Debtors' adjusted line 50 amount falls below $117.08 per month, Debtors rebut the presumption. But if Debtors' adjusted line 50 amount falls at or above that amount, they rebut the presumption of abuse *only* if their adjusted line 50 amount, when multiplied by 60, is less than 25 % of their total "nonpriority unsecured claims in the case." *See*

---

[11] *See* Docket # 60 at 7, line 55.

11 U.S.C. § 707(b)(2)(A)(i)(I); 707(b)(2)(B)(iv)(I).[12]

Thus, *if* all of the numbers in Debtors' mean test form are accurate and appropriate — something the UST disputes — Debtors cannot rebut the presumption of abuse unless they first prove "special circumstances" expenses of at least $106.22 per month ($301.63 minus $195.41 = $106.22). And if they succeed in proving this, Debtors then must prove that they also pass the secondary presumption determination, described above.

Debtors argue that they have met their burden of proof, based among other things on the $900.00 per month Catholic school tuition expense. If this expense is allowed in full as a "special circumstance," it would reduce Debtors' $301.63 monthly disposable income to below zero, and this would rebut the presumption of abuse. (In this event, the secondary presumption determination described above would not apply.)

The UST argues that the Debtors' Catholic school tuition expense cannot be considered a "special circumstances" expense, and therefore cannot rebut the presumption of abuse. And the UST argues that several of the other numbers in Debtors' means test form are not correct or appropriate. When these numbers are adjusted appropriately, the UST argues, the Debtors fail to rebut the presumption of abuse, even if the Catholic school tuition is allowed in full as a "special circumstances" expense.

The Court will now consider the means test numbers in dispute, including the Catholic school tuition item.

### b. Lisa Maura's initial CMI amount

While it is not entirely clear, in closing argument after the evidentiary hearing, the UST

---

[12] This secondary presumption calculation is reflected on lines 53-55 of the means test form, which uses the phrase "total non-priority unsecured debt," rather than the exact statutory phrase, quoted above, *i.e.*, total "nonpriority unsecured claims in the case." (*See* Docket # 60 at 7).

appears to have argued that Lisa Maura's initial CMI amount, stated as $5,579.89 per month on line 3 of Debtors' means test form, is understated. The UST seems to have argued that the correct amount for this item is $5,886.40 per month, *i.e.*, $306.51 per month higher than Debtors' means test form states.[13] This argument is without merit. The higher number argued by the UST is based on what Lisa Maura's rate of pay was as of the date her bankruptcy petition was filed.[14] But the relevant time for calculating a debtor's initial CMI amount, which the Bankruptcy Code refers to as "current monthly income," is not as of the petition date. Rather, it is the average of the last full six calendar months before the petition date. *See* 11 U.S.C.

§§ 707(b)(2)(A)(i) (using the term "current monthly income"); 101(10A)(A)(defining "current monthly income"). "Current monthly income" is defined, in pertinent part, as:

> the average monthly income from all sources that the debtor
> receives (or in a joint case the debtor and the debtor's spouse
> receive) . . . derived during the 6-month period ending on—
> (i) the last day of the calendar month immediately preceding the
> date of the commencement of the case . . ..

11 U.S.C. § 101(10A)(A). In this case, the Debtors attached to their means test form a detailed explanation of how they calculated the "current monthly income" for each of them.[15] The amount shown for Lisa Maura is based on the gross income that she earned during the relevant six month period, as shown by her paystubs, divided by six. There is no evidence in the record contradicting this, or tending to cast any doubt on it. The Court finds that in their means test form, Debtors correctly stated the "current monthly income" (which is referred to sometimes in this opinion above as the "initial CMI amount") for Lisa Maura, as $5,579.89.

---

[13] *See* Tr. (Docket # 84) at 33-34.

[14] *See id*

[15] Docket # 60 at 9; UST-10 at ninth page.

### c. Line 22A: Debtors' deduction for "Local standards: transportation; vehicle operation expense"

On Line 22A of their means test form, Debtors listed a monthly expense of $882.00 for the item called "Local standards: transportation; vehicle operation/public transportation expense." The statutory basis for this category of expense deduction (the "IRS Local Transportation Expense") is in the first sentence of 11 U.S.C. § 707(b)(2)(A)(ii)(I), which states:

> The debtor's monthly expenses shall be **the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards**, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order for relief, for the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case, if the spouse is not otherwise a dependent.

(emphasis added). This lengthy statutory sentence refers to three categories of expenses published by the Internal Revenue Service (the "IRS"): the "National Standards," the "Local Standards," and the "Other Necessary Expenses." The IRS Local Transportation Expense is one of the expense categories contained in the IRS Local Standards. The Local Standards are published on a website maintained by the IRS, and they also are reproduced on a UST website.[16] It is undisputed that the IRS Local Standards applicable to this case[17] allow an "Operating Costs" amount of $294.00 per month for "One Car" and $588.00 per month for "Two Cars."[18] The Local Standards do not state any other amounts or possible amounts, or refer to any other number of cars.

---

[16] *See* http://www.irs.gov/Businesses/Small-Businesses-&-Self-Employed/Local-Standards: -Transportation; http://www.justice.gov/ust/eo/bapcpa/meanstesting.htm.

[17] The amounts may vary by the time period when the bankruptcy case was filed, and by census regions and particular metropolitan statistical areas within census regions.

[18] *See* http://www.justice.gov/ust/eo/bapcpa/20100315/bci_data/IRS_Trans_Exp_Stds_MW.htm.

In claiming a monthly amount of $882.00 for this expense category, Debtors have claimed an operating expense for each of *three* cars that they own,[19] at $294.00 per car. The UST argues that this is improper, because in listing allowable expenses only for "One Car" and for "Two Cars," the IRS Local Standards only allow an operating expense for a maximum of two cars, in the maximum amount of $588.00. As a result, the UST argues, Debtors' Line 22A expense amount must be reduced by $294.00, from $882.00 to $588.00.

Debtors argue that the IRS Local Standards allow for a Transportation Expense higher than the Two Cars/$588.00 amount, in cases where the debtor's necessary transportation expenses are in fact higher. And Debtors argue that their expenses are higher. Debtors rely on certain provisions in the IRS's "Collection Financial Standards." As the Supreme Court has noted, the Collection Financial Standards are "the IRS's explanatory guidelines to the National and Local Standards." *See Ransom v. FIA Card Servs., N.A.*, 131 S. Ct. at 726.

In one of their briefs, the Debtors cite the Collection Financial Standards, and put their argument this way:

> The Trustee alleges that Columbo and Lisa Maura overstated their deduction for Motor Vehicles by $294.00. As noted in the IRS Local Transportation Expense Standards, "these standards do not include personal property taxes," which can serve as deductions on the Means Test, whether in Line 22A or under Line 25. Nor does the standard deduction take into account the massive amount that Columbo Maura drives as a traveling salesman for Lipari Foods. Additionally, the IRS Standards 5.15.1.7 paragraph 6, states that "other expenses may be allowed if they meet the necessary expense test." Further, IRS Standard 5.15.1.9(1)(8) states that "substantiation for the operating allowance is not required unless

---

[19] When they filed this case, Debtors owned a 2004 Saturn Vue; a 2007 Ford Escape; and a 2008 Ford Taurus. (*See* Schedule B (Docket # 11), DX-B; UST-1). In their bankruptcy schedules, Debtors also listed a fourth car, a 2004 Ford Freestar Van, which was seized by a secured creditor about four months before the Debtors filed their bankruptcy case. Debtors listed this vehicle in their Schedule D with a zero value, but did not list it at all in their Schedule B. (*See* Schedules B and D, and Statement of Financial Affairs item 4(b) (Docket # 11 and DX-B and UST-1).

the amount claimed exceeds the standard." Accordingly, the IRS Standards, which the Means Test is based upon, allow for operating expense in excess of local standards when necessary. Accordingly, this can be a deduction in Line 22A or in Part VII of the Means Test.[20]

Before discussing Debtors' primary argument about Line 22A, the Court will briefly address one of the Debtors' other arguments in the above-quoted passage. Even if Debtors were correct in their argument that personal property taxes on their vehicles are additional expenses that Debtors can add to their Line 22A transportation expense, or include in Line 25 of the means test form, the argument is unavailing in this case, because Debtors presented no evidence that they pay *any* personal property taxes on any of their vehicles.

In considering Debtors' primary argument, based on the Collection Financial Standards, the Court must begin with what the Supreme Court said about the Collection Financial Standards in *Ransom*. While Bankruptcy Code § 707(b)(2)(A)(ii)(I), quoted above, adopts the IRS's National Standards and Local Standards, the Supreme Court held that "the statute does not incorporate the IRS's guidelines." *See Ransom*, 131 S.Ct. at 726. The Supreme Court's reference here to the IRS guidelines included the IRS's Collection Financial Standards. The Court discussed the limited use that courts may make of these IRS guidelines, in deciding what expenses are allowable in the § 707(b)(2) context. The Court explained:

> Although the statute does not incorporate the IRS's guidelines, courts may consult this material in interpreting the National and Local Standards; after all, the IRS uses those tables for a similar purpose — to determine how much money a delinquent taxpayer can afford to pay the Government. The guidelines of course cannot control if they are at odds with the statutory language.
> . . .

---

[20] Br. in Response to U.S. Trustee's Br. in Support of Mot. (Docket # 49), at 11-12 (citations to attached exhibits omitted).

> Because the dissent appears to misunderstand our use of the
> Collection Financial Standards, and because it may be important
> for future cases to be clear on this point, we emphasize again that
> the statute does not "incorporat[e]" or otherwise "impor[t]" the
> IRS's guidance. Post, at 730, 732 (opinion of SCALIA, J.).  The
> dissent questions what possible basis except incorporation could
> justify our consulting the IRS's view, post, at 732, n., but we think
> that basis obvious: The IRS creates the National and Local
> Standards referenced in the statute, revises them as it deems
> necessary, and uses them every day.  The agency might, therefore,
> have something insightful and persuasive (albeit not controlling) to
> say about them.

131 S.Ct. at 726 & n.7.

From this passage in *Ransom*, the Court draws the following conclusions about the IRS

guidelines, including the IRS Collection Financial Standards:

- Bankruptcy courts "may consult" the guidelines "in interpreting the National and Local Standards;" but

- The "statute," *i.e.*, Bankruptcy Code § 707(b)(2)(A)(ii)(I), "does not 'incorporat[e]' or otherwise 'impor[t]' the IRS's guidance;" and

- The IRS guidelines "cannot control if they are at odds with the statutory language."

The problem with the Debtors' argument, and their reliance on the IRS guidelines, is that

they are inconsistent with the language of § 707(b)(2)(A)(ii)(I).  That section, quoted above, says

in pertinent part that the expenses to be included in the means test "shall be the debtor's

applicable monthly **expense amounts specified under the** National Standards and **Local**

**Standards** . . .." (emphasis added).   Under this language, the Line 22A Transportation Expense

can be no higher than the "monthly expense amounts specified" in the IRS Local Standards.  As

noted above, the IRS Local Standards "specify" two, and only two, possible amounts for the Line

22A Transportation Expense, other than zero.  These are a specific dollar amount for "One Car"

($294.00) and a specific dollar amount for "Two Cars" ($588.00).[21]  The Local Standards do not

specify any amount for *three* cars.  Nor do they specify any amounts that may be added if a

particular debtor owns and operates more than two cars, or if a particular debtor has

transportation expenses that are higher than the amounts specified for "One Car" and for "Two

Cars."

In this case, therefore, Debtors may deduct a line 22A expense amount for the maximum

"Two Cars" amount of $588.00, and no more, because they operate two cars or more.  That is the

Local Standards expense amount that is "applicable" to the Debtors, rather than the lower "One

Car" amount, because the Debtors actually operate two cars or more.  *See Ransom*, 121 S.Ct. at

724 (an expense amount specified in the IRS Local Standards is "applicable" to a debtor if the

debtor actually has expenses in that category of the Local Standards; *i.e.*, "[a] debtor may claim a

deduction from a National or Local Standard table (like '[Car] Ownership Costs') if but only if

that deduction is appropriate for him. And a deduction is so appropriate only if the debtor has

costs corresponding to the category covered by the table . . ..").[22]

The Debtors' argument, that they can take a vehicle operating expense amount higher

than the "Two Cars" amount of $588.00, finds no support in the IRS Local Standards themselves.

Debtors cite as support only the IRS Collection Financial Standards.  To the extent those

---

[21]  As noted above, these specific dollar amounts for "One Car" and for "Two Cars" may vary by region of the country.  But for each region they are specific, fixed amounts.

[22]  *Ransom* did not directly concern the IRS Local Standards for the Transportation Expense (Line 22A of the means test form).  The Court did refer briefly to this expense, as vehicle "Operating Costs."  *See* 131 S. Ct. at 725-26.  The issue in *Ransom* concerned the IRS Local Standards vehicle ownership expense, Line 23 of the means test form.  *Ransom* held that this expense item concerned the costs of a car loan or lease, and nothing else, and that a debtor who owns a car free and clear of any car loan or lease cannot claim this category of expense.  The Court reasoned that such an expense is not "applicable" to such a debtor, within the meaning of Bankruptcy Code § 707(b)(2)(A)(ii)(I).  *See* 131 S. Ct. at 724-26.

Collection Financial Standards support the Debtors' argument, however, they cannot control. This is because (1) as discussed above, *Ransom* held that Bankruptcy Code § 707(b)(2)(A)(ii)(I) "does not 'incorporat[e]' or otherwise 'impor[t]'" the Collection Financial Standards; and (2) for the reasons discussed above, the Debtors' argument is, to borrow a phrase from *Ransom*, "at odds with the statutory language" of § 707(b)(2)(A)(ii)(I).

The Debtors have cited no case that supports their argument about the Line 22A expense. But there is now at least one published case that does support Debtors' argument. In *In re Johnson*, 454 B.R. 882 (Bankr. M.D. Fla. 2011) the Chapter 7 debtor owned three cars, and claimed a Line 22A vehicle operating expense for all three cars. The debtor claimed the Local Standards amount of $239.00 per vehicle for the two newest of his cars, as permitted by the IRS Local Standards applicable to the region and date of that bankruptcy case, *plus* a Line 22A operating expense amount of $200.00 for the third car. In seeking dismissal of the case, the United States Trustee argued that the debtor could not claim an operating expense for the third car. *See Johnson,* 454 B.R. at 884-85. The United States Trustee moved for summary judgment on its motion to dismiss. The bankruptcy court denied that motion. The court relied on language in the IRS guidelines, including the Collection Financial Standards and the IRS's Internal Revenue Manual, to hold that a Debtor *may* claim an operating expense for a third car, if the third car "is reasonably necessary for the care and support of the Debtor and the Debtor's dependents." *See id.* at 894.

This Court respectfully disagrees with the *Johnson* case, for the reasons stated above. And the Court agrees with the approach taken by the bankruptcy court in another case, *In re VanDyke*, 450 B.R. 836 (Bankr. C.D. Ill. 2011). In *VanDyke*, the Chapter 13 debtor claimed an operating expense for two cars she owned, as permitted by the IRS Local Standards, *plus* an extra

$200 monthly operating expense on one of the cars — referred to by the court as an "old-car" deduction. The debtor relied on language in the IRS Internal Revenue Manual. The *VanDyke* court disallowed the $200 expense, holding that the debtor was limited to the operating expense amounts stated in the IRS Local Standards.

While VanDyke did not involve the third-car issue, unlike this case and the *Johnson* case, the *VanDyke* court's reasoning supports this Court's view of the third-car issue:

> The Bankruptcy Code's directive is clear: the debtor's monthly expenses "shall be the debtor's applicable monthly expense amounts specified under the . . . Local Standards . . . issued by the Internal Revenue Service." The National and Local Standards referred to in section 707(b)(2)(A)(ii)(I) are not contained in the Collection Financial Standards, but are separately set forth in a series of tables. The language of the statute is plain and the numbers in the charts are fixed amounts. The National and Local Standards are the key elements in establishing a uniform formula to calculate a debtor's disposable income, supplanting the pre-BAPCPA case-by-case determination with its perceived inconsistencies and unfairness.
>
> *Ransom* precludes resort to the IRS guidelines because the additional operating expense directly contradicts the language of the Bankruptcy Code. The "additional operating expense," as it is sought to be applied to all debtors who own an unencumbered vehicle older than 6 years or having mileage in excess of 75,000 miles, comes in the guise of a supplement to the Local Standards for vehicle operation expense. No reference is made to it in the tables. It is a separate adjustment which is not a part of the Local Standards. . . . The allowance of an additional amount as set forth in the IRS guidelines is not a matter of **interpretation** of the Local Standards for transportation, but one of its **revision**.

450 B.R. at 841-42 (emphasis added)(footnotes and citations omitted).

For the reasons stated above, the Court concludes that Debtors' Line 22A deduction for the vehicle operating expense cannot exceed $588.00. The $882.00 the Debtors claimed on Line 22A, therefore, must be reduced by $294.00.

**d. Line 26: Debtors' deduction for "Other Necessary Expenses: involuntary**

**deductions for employment"**

On Line 26 of their means test form, Debtors list a monthly expense of $393.00 for the item called "Other Necessary Expenses: involuntary deductions for employment." The instructions on this line of the means test form state the following: "Enter the total average monthly payroll deductions that are required for your employment, such as retirement contributions, union dues, and uniform costs. **Do not include discretionary amounts, such as voluntary 401(k) contributions."** (Bold emphasis in original). The monthly payroll deductions that are included in the $393.00 amount are the following:

For Debtor Columbo Maura:

| | |
|---|---|
| "401k loan" | $75.00 |
| "Wireless Modem" | $42.00 |

For Debtor Lisa Maura:

| | |
|---|---|
| "403B" | $150.00 |
| "Retirement Loan #1" | $50.00 |
| "Retirement Loan #2" | $74.00 |

These items actually total $391.00 per month, rather than the $393.00 that Debtors state on Line 26. The above numbers, and the descriptions of the items listed above, are taken from the Debtors' most recent amended Schedule I, which Debtors filed the same day they filed their most recent amended means test form.[23]

The UST objects to inclusion of all of these monthly expenses in Line 26 of the Debtors' means test form, except for the $42.00 expense for the wireless modem. The testimony of Debtor Columbo Maura proved, and the UST does not dispute, that the deduction from Mr. Maura's paycheck by his employer for the cost of a wireless modem is required by Mr. Maura's

---

[23] *See* DX-E (Docket # 59) at pdf p.14 (amended Schedule I); UST-10 (Docket # 60) at pdf p.4 (Line 26, means test form).

employer.

It is undisputed that the $150.00 per month "403B" item listed above is for a *voluntary* contribution to Lisa Maura's retirement plan. It is clear that this payroll deduction by Lisa Maura is not required by her employer. As the last sentence of the instructions for Line 26 of the means test form states, in bold, "**[d]o not include discretionary amounts such as voluntary 401(k) contributions.**" Lisa Maura's "403B" contributions are like voluntary 401(k) contributions in this context, and are not a proper Line 26 expense.

The remaining items are deductions for the repayment of loans taken by Columbo Maura from his 401(k) plan and by Lisa Maura from her 403(b) retirement plan. The UST argues that none of these loan repayments are mandatory or involuntary deductions that are required for the Debtors' employment. As a result, the UST argues, these amounts are not properly included in Line 26 of the means test form.

The Court agrees with the UST. Many cases have held that a debtor's 401(k) loan repayments are not involuntary payroll deductions required for employment, and therefore are not properly included in Line 26. *See, e.g., In re Egebjerg*, 574 F.3d 1045, 1051 (9th Cir. 2009); *In re Koch*, 408 B.R. 539, 543 (Bankr. S.D. Fla. 2009); *In re Barker*, 2013 WL 796171 (Bankr. N.D. Ohio 2013) at *3, 4.

The payroll deductions for Columbo Maura's repayment of his 401(k) loan and for Lisa Maura's repayment of her two 403(b) loans are not required for either Debtor's employment, and thus are not permissible deductions on Line 26. It may be commonplace for such retirement plan loans to be repaid through periodic payroll deductions, and it may even be commonplace for employer retirement plans to require an employee to authorize such repayment through payroll deductions as a condition to obtaining a loan. But the Debtors have not presented any evidence

of either of these things, or that either of these things is true with respect to their retirement plan loans.

And even if the Court assumes these things to be so, the Debtors presented no evidence that they cannot revoke or terminate any authorizations they previously gave for payroll deductions to repay these loans. To the contrary, the only evidence in the record on this subject indicates otherwise.

The Debtors presented no documentation or evidence on this subject regarding Columbo Maura's 401(k) loan. With respect to Lisa Maura's 403(b) loans, the only documentation presented is Debtors' Exhibit M, which consists of two loan agreements between Lisa Maura on the one hand and her employer's 403(b) retirement plan on the other hand. Each two-page document is entitled "Loan Note and Security Agreement." One has a "date of note" of November 26, 2008, while the other has a "date of note" of July 31, 2009. The more recent of these loan agreements expressly authorizes Lisa Maura's employer to withhold the required loan payments from her compensation, "on an equal BI-WEEKLY installment basis."[24] Nothing in this document suggests that such authorization is irrevocable. Rather, the document contemplates that the employee can later revoke her authorization for loan payments through payroll deduction, even though remaining in active employment. The document states that the entire unpaid balance of the 403(b) loan would become immediately due and payable, at the option of the 403(b) retirement plan, if, among other grounds, "[m]y authorization to my Employer to withhold [the loan payment] from my compensation is revoked by me or becomes invalid even though I continue to remain in active employment."[25] The other Loan Note and

---

[24] *See* DX-M, second page, top paragraph of text.

[25] *Id.* at second page, "Acceleration; Default" section, item 4.

Security Agreement in Exhibit M, the one dated November 26, 2008, does not contain any authorization for payroll deduction at all. And nothing in that document indicates that if the employee separately authorizes a payroll deduction as the means of loan repayment, such authorization could not be later revoked by the employee.[26]

Debtors argue that Lisa Maura's 403(b) voluntary contribution of $150.00 per month is necessary to take advantage of her employer's program of making matching contributions.[27] Even if that is true, it does not make Lisa Maura's 403(b) contributions involuntary or mandatory, or required for her employment. Rather, it is undisputed that Lisa Maura could elect *not* to make any 403(b) contributions through payroll deduction, without any adverse effect on her employment.

Finally, Debtors point out that if they did not make Lisa Maura's voluntary 403(b) contributions, or if they did not make their periodic retirement plan loan payments, they would suffer adverse tax consequences, thereby increasing their tax expense.[28] And they say that this, in turn, would result in a higher permissible expense deduction on Line 25 of the means test form ("Other Necessary Expenses: Taxes.") But the flaw in this argument is that there is no evidence that the Debtors actually had stopped making Lisa Maura's voluntary 403(b) contributions or actually had stopped making their 401(k) and 403(b) loan payments. So, the Debtors presented no evidence that they actually had begun to incur the higher tax liability that would be caused by such actions. The mere fact that these items are disallowed as Line 26 involuntary payroll deduction expenses does not mean that the Court should assume that the Debtors will no longer

---

[26] DX-M, third and fourth pages.

[27] *See, e.g*, Debtors' Br. (Docket # 49) at 13.

[28] *Id*.

incur these expenses and will increase their tax liability that can be claimed on Line 25. And as the instructions on Line 25 say, a debtor can claim only taxes the debtor "actually incur[s]."

For these reasons, the Court agrees with the UST that the Debtors' permissible expense amount for Line 26 of the means test form is $42.00, not the $393.00 claimed by Debtors. This reduces the total amount of expense deductions the Debtors may take on their means test form by $351.00 per month.

**e. Line 34(c): Debtors' deduction for "Health Savings Account"**

The next area of dispute concerns Line 34 of the means test, which is for "Health Insurance, Disability Insurance, and Health Savings Account Expenses." On Line 34(c), Debtors listed an expense amount of $347.00 per month for "Health Savings Account." This expense, when added to the expense Debtors listed on Line 34(a) for "Health Insurance" of $456.00 per month, yields a total Line 34 expense of $803.00 per month.

It is undisputed that the Debtors each have health savings accounts through their employment; that Debtor Columbo Maura contributes $121.00 per month to his account; and that Debtor Lisa Maura contributes $226.00 per month to her account. These contributions are done through payroll deductions, and total $347.00 per month.[29] The UST objects to the Debtors listing the full $347.00 amount in Line 34(c), however, on the ground that this amount impermissibly duplicates the $300.00 per month expense claimed by Debtors on Line 19B of the means test form, which is labeled "National Standards: health care." According to the UST, the correct amount that Debtors may deduct on Line 34(c) is only $47.00 — $347.00 minus the $300.00 already deducted on Line 19B.

---

[29]These amounts are taken from the Debtors' most recent amended Schedule I, DX-E (Docket # 59) at pdf p.14.

As discussed below, Debtors do not really dispute this. And the Court agrees with the UST. The instructions right above Line 34 on the means test form, which labels that section of the form "Subpart B: Additional Living Expense Deductions," correctly state in bold: "**Note: Do not include any expenses that you have listed in Lines 19-32.**" (Bold emphasis in original). The Line 19B expense deduction is for out-of-pocket health care expenses — *i.e.*, healthcare expenses not paid for by health insurance — and does not include the cost of purchasing health insurance. For that reason, the National Standards for Line 19B say that "[t]he out-of-pocket health care standard amount is allowed in addition to the amount taxpayers pay for health insurance." *See* National Standards, available at http://www.justice.gov/ust/eo/bapcpa/20100315/meanstesting.htm.

Thus, it is not an impermissible duplication for Debtors to have included the $456.00 per month cost of health insurance on Line 34(a) of the means test form, in addition to the $300.00 Line 19B amount for out-of-pocket health care expense. The same is *not* true, however, for the Line 34(c) expense for Debtors' health savings accounts. That is because the monthly amount that Debtors contribute to their health savings accounts is later reimbursed to them — in effect, spent by them — *for out-of-pocket health care expenses*. This is undisputed, and it is confirmed by the testimony of Lisa Maura, and by annual account statements from each of the Debtors' health savings accounts.[30] Thus, the $300.00 expense claimed by Debtors in Line 19B, which is the National Standards amount for out-of-pocket health care expenses for a family of the Debtors' size, impermissibly duplicates $300.00 of the $347.00 Line 34(c) expense claimed by Debtors for their health savings accounts.

At the evidentiary hearing, Debtors did not actually dispute this. Instead, Debtors'

---

[30] *See* testimony of Lisa Maura, Tr. (Docket # 85) at 73-75; DX-S, DX-T.

counsel argued in closing argument only that if the Debtors reduced their health savings account contributions by $300.00, to only $47.00 per month, Debtors would have a higher tax liability, which then would increase their deduction for "Other Necessary Expenses: Taxes" on Line 25 of the means test form.[31] This is very similar to the argument Debtors made with respect to their Line 26 403(b) and 401(k) contributions and loan repayments, discussed above. This tax argument is also without merit in this Line 34(c) context, for the same reasons discussed above. Because Debtors did not argue or present any evidence that they actually had reduced or ceased making their health savings account contributions, there is no evidence that Debtors actually have incurred the higher tax liability that would be associated with such a change. Thus, the Court's disallowance of $300.00 of Debtors' $347.00 monthly contributions to their health savings accounts, as a Line 34(c) expense, does not permit Debtors to increase their Line 25 deduction for taxes.

For these reasons, the Court agrees with the UST that the Debtors' permissible expense amount for Line 34(c) must be reduced to $47.00 for a net reduction of $300.00 per month in expense deductions that Debtors may take on their means test form.

### 3. Debtors' efforts to rebut the presumption of abuse with "special circumstances"

As discussed above, the total of the expense deductions that Debtors are allowed under § 707(b)(2), as shown by their means test form, must be reduced by the total amount of $945.00 per month. This is the sum of the reductions that the Court has found to be required for Lines 22A ($294.00), 26 ($351.00) and 34(c)($300.00).

This reduction in allowable expenses changes the total amount of expenses on Lines 47 and 49 of the means test form, from the $11,243.76 per month claimed by Debtors to $10,298.76.

---

[31] *See Tr.* (Docket # 84) at 4-5.

This, in turn, increases the Debtors' "[m]onthly disposable income under § 707(b)(2)" on Line 50 from $301.63 per month to $1,246.63 per month. When this number is multiplied by 60, the Line 51 amount — *i.e.*, the "60 month disposable income under § 707(b)(2)" — increases from $18,097.80 to $74,797.80. This, of course, is much further above the $11,725.00 amount, above which the presumption of abuse arises.

As explained in more detail in part III.A.2.a of this opinion, in order to rebut the presumption of abuse, Debtors must show "special circumstances" of the type described in § 707(b)(2)(B), which justify adjustments to the Debtors' income or expenses, and the amount of which bring the Line 52 amount to below $11,725.00. Then, if applicable, Debtors must also pass the "secondary presumption determination," discussed in part III.A.2.a of this opinion.

To try to rebut the presumption of abuse, Debtors have argued two forms of alleged "special circumstances." First, Debtors point to their $900.00 per month expense to send their children to Catholic schools, rather than to public schools. Second, Debtors point to the fact that Lisa Maura has an obligation to repay student loans in the amount of $205.00 per month (loans that are generally nondischargeable under 11 U.S.C. § 523(a)(8)). The Court will now discuss these claimed special circumstances.

### a.  The concept of "special circumstances"

As noted in part III.A.1 of this opinion, the types of "special circumstances" that may be used by a debtor to rebut the § 707(b)(2) presumption of abuse are these:

> the presumption of abuse may only be rebutted by demonstrating
> special circumstances, such as a serious medical condition or a call
> or order to active duty in the Armed Forces, to the extent such
> special circumstances that justify additional expenses or
> adjustments of current monthly income for which there is no
> reasonable alternative.

11 U.S.C. § 707(b)(2)(B)(i). The phrase "special circumstances" is not defined in the

Bankruptcy Code, and the courts have taken varying views on what may qualify as "special circumstances." *See, e.g., In re Harmon*, 446 B.R. 721, 728 (Bankr. E.D. Pa. 2011)(summarizing the differing views and citing cases). The Court agrees with the stricter view expressed in a number of the cases. That view is explained and supported, for example, by the court in *In re Lightsey*, 374 B.R. 377 (Bankr. S.D. Ga. 2007). *Lightsey* held that to qualify as a "special circumstance," among other things, the circumstance must be "unforeseeable or beyond the control of the debtor." 374 B.R. at 382. The *Lightsey* court explained:

> The ["special circumstances"] exception does not permit every conceivable unfortunate or "unfair" circumstance to rebut the presumption of abuse, but includes only those circumstances that cause higher household expenses or adjustments of income "for which there is no reasonable alternative," **i.e., they are unforeseeable or beyond the control of the debtor.** . . . *In re Sparks,* 360 B.R. 224, 230 (Bankr.E.D.Tex. 2006)("**The special circumstances exception] must be strictly construed to allow only those expenses which are truly unavoidable to the debtor**."); *In re Tranmer,* 355 B.R. 234, 251 (Bankr.D.Mont.2006)("Section 707(b)(2)(B)'s 'special circumstances' contemplates circumstances **beyond a debtor's reasonable control**.") As one court cogently observed:
>
> > Under the statutory interpretation canon of *ejusdem generis,* a court is to limit the sphere of permissible "special circumstance" to one's having such similar traits and characteristics. This interpretive doctrine, meaning literally "of the same kind," holds that a court is to interpret legislatively provided examples of a specific nature as typical of the general category covered. *U.S. v. Parson,* 955 F.2d 858, 869 fn. 15 (3rd Cir. 1992). . . .
>
> . . . To qualify, the "special circumstance" must affect a debtor's ability to repay because there are "additional expenses" or a reduction in [Current Monthly Income], and there must be no reasonable alternative available to the debtor to avoid such extra expense or reduction in income. . . . Only documented income reductions or unusual living expenses, excluding debt repayment, qualify.

374 B.R. at 381-83 (emphasis added)(footnotes and some citations omitted). A similar view was taken by the court in *In re Burggraf*, 436 B.R. 466, 471-72 (Bankr. N.D. Ohio 2010). Quoting in part from several other cases, the *Burggraf* court held that "special circumstances" "normally" require that the circumstances be "beyond the debtor's control," or otherwise be "highly unusual, and of the type not normally encountered by most debtors;" "extraordinary or exceptional;" and "unexpected or involuntary." *See* 436 B.R. at 472. The court explained:

> The Bankruptcy Code does not specifically define what constitutes a "special circumstance" as applied to § 707(b)(2)(B)(i). This provision, however, does provide two examples: (1) a serious medical condition; or (2) a call to active duty in the Armed Forces. Although these conditions are not exclusive, this Court—applying the statutory interpretation canon of *ejusdem generis,* meaning literally "of the same kind,"—has found that a condition giving rise to a "special circumstance" should be similar in nature and have characteristics similar to the examples provided in § 707(b)(2)(B)(i). *In re Castle,* 362 B.R. 846, 851 (Bankr.N.D.Ohio 2006). To this end, this Court has observed that the examples in § 707(b)(2)(B)(i) "do show a commonality [in that] they both constitute situations which not only put a strain on a debtor's household budget, but **they arise from circumstances normally beyond the debtor's control**." *Id.* . . .

> Notwithstanding, nothing in § 707(b)(2)(B)(i) absolutely requires that a 'special circumstance' arise as the result of an event beyond the debtor's reasonable control. Thus, the Court will not read into § 707(b)(2)(B)(i) an involuntariness prerequisite. At the very least, however, it may be safely stated that a debtor who requests a finding of "special circumstances" seeks preferential treatment over other similarly situated debtors. . . .

> Thus, it follows that, **where the circumstances are not involuntary, the "special circumstances" contemplated by § 707(b)(2)(B)(i) must be highly unusual, and of the type not normally encountered by most debtors**. As stated by one bankruptcy court:

>> Both a reading of the plain unambiguous language of 11 U.S.C. Section 707(b)(2)(B) and the BAPCPA legislative history lead to the same result: A debtor

> asserting "special circumstances" in support of
> additional expenses or income adjustment must
> establish **the circumstances are extraordinary or
> exceptional, are unexpected or involuntary**, and
> place the debtor in dire need of Chapter 7 relief.
>
> *In re Stocker*, 399 B.R. [522,] 532 [(Bankr.M.D.Fla. 2008)].

*In re Burggraf*, 436 B.R. at 471-72 (emphasis added)(some citations omitted).

The Court agrees with the strict view of "special circumstances," as set forth in the *Lightsey* and *Burggraf* cases, as being most faithful to the statutory language in § 707(b)(2)(B)(i), quoted above, and to the Congressional purpose in adding current § 707(b)(2) to the Bankruptcy Code in 2005, discussed in part III.A.1 of this opinion.

### b. Lisa Maura's student loan payments

The evidence is undisputed that Lisa Maura is obligated to repay student loans, in the amount of $205.00 per month. In closing argument at the evidentiary hearing, Debtors' counsel acknowledged that "there's nowhere in the means test to account for that." But, Debtors' counsel suggested, this expense could be a "special circumstance" to help rebut the presumption of abuse.[32]

The Court disagrees. The Court agrees with the cases holding that a debtor's obligation to make student loan debt payments is not a "special circumstance" of the type that qualifies under § 707(b)(2)(B). *See, e.g.*, *Burggraf*, 436 B.R. at 472-74; *Lightsey*, 374 B.R. at 381-82 n.3 (dictum).

Applying the standards of the *Lightsey* and *Burggraf* cases, discussed above, Lisa Maura's obligation to repay her student loan debt, at the rate of $205.00 per month, is not "unforeseeable" or "unexpected;" is not "beyond the control of the debtor" or "involuntary." Nor

---

[32] *See* Tr. (Docket # 84) at 5.

is it "highly unusual, and of the type not normally encountered by most debtors;" or "extraordinary or exceptional." Rather, like the student loan debt in the *Burggraf* case, Lisa Maura's student loan debt was incurred by her "in a deliberate manner;" and "among debtors who seek bankruptcy relief, student loans are commonplace. As a consequence, such loans hardly rise to the level of an unusual, extraordinary or exceptional circumstance." *Burggraf*, 436 B.R. at 472, 474.

Nor does the fact that student loan debt is generally nondischargeable under 11 U.S.C. § 523(a)(8)[33] make it a "special circumstance" under § 707(b)(2)(B). As the court noted in *Lightsey*,

> If non-dischargeability was the standard for a special circumstance, Congress would have said so. Those courts concluding that "special circumstances" include non-dischargeable student loan obligations arguably will have to apply this standard to every other non-dischargeable obligation, [including] debts arising not only from student loans but also from fraud, embezzlement, DUI, and the like. *See* 11 U.S.C. §§ 523 and 1328(a). Every one of these non-dischargeable obligations could qualify as debts for which a debtor has no reasonable alternative but to continue payments to avoid economic harm, and there is no suggestion in Section 707(b)(2)(B) that courts have been delegated the policy decision of deciding that some non-dischargeable debts are "good" and some are "bad" so as to permit treating some but not all as a "special circumstance."

374 B.R. at 381-82 n.3.

### c. Catholic school tuition

The Debtors' primary argument in attempting to rebut the presumption of abuse is that

---

[33] Student loan debt is nondischargeable, in cases under Chapter 7 and Chapter 13, and in Chapter 11 cases where the debtor is an individual, unless "excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents." *See* 11 U.S.C. §§ 523(a)(8); 1328(a)(2); and 1141(d)(2). Under the standards established by case law, demonstrating such "undue hardship" is difficult. *See, e.g.*, *Oyler v. Educ. Credit Mgmt. Corp.* (*In re Oyler*), 397 F.3d 382, 385 (6th Cir. 2005).

the $900.00 per month that Debtors spend to send their children to Catholic schools is a "special circumstance" under § 707(b)(2)(B). This $900.00 is the amount that was claimed by Debtors on their means test form, and in their most recent amended Schedule J.[34] The UST has not disputed that Debtors actually spend this amount to send their two younger children to Catholic schools. During the evidentiary hearing, Lisa Maura testified that for the following school year the tuition expense for her two younger children would total $13,140.00, which equates to $1,095.00 per month.[35]

Regardless of which monthly expense amount is used, $900.00 or $1,095.00, the Court agrees with the UST that this parochial school expense does not qualify as a "special circumstance" that may be used to help rebut the presumption of abuse. This is so for the following reasons.

First, to qualify as such "special circumstances," the statute requires that the circumstances "justify additional expenses. . . for which there is no reasonable alternative." 11 U.S.C. § 707(b)(2)(B)(i). Assuming that parochial school tuition may ever be considered "special circumstances" within the meaning of this statute, the Debtors in this case have failed to meet their burden of proving that "there is no reasonable alternative" to paying to send their children to Catholic schools. The UST presented detailed, uncontradicted testimony from their expert witness, Paul Smith, which demonstrated that the Dearborn Public Schools, which Debtors' children could attend tuition-free, are clearly a reasonable alternative to the Catholic schools the Debtors' children attend, in every respect but one.[36] That one exception is with

---

[34] Docket # 60 at pdf p.7 (means test form); DX-E (Docket # 59) at pdf p.16 (amended Schedule J).

[35] Tr. (Docket # 85) at 29-30.

[36] *Id.* at 88-111.

respect to the Catholic religious education that is provided by the Catholic schools. During her

testimony, Lisa Maura expressed some concerns about safety and security at the public schools,

compared to the Catholic schools, but the Debtors presented no admissible evidence that the

safety and security in the Dearborn Public Schools was any lower than that at the Catholic

schools that Debtors' children attend.

With respect to the religious aspects of their children's education in the Catholic schools,

the Debtors' testimony established, without contradiction, that the Catholic schools offer

religious education that the public schools do not and cannot offer, and that the Catholic schools

also provided Catholic religious practices such as liturgies, prayers, and retreats that are not

available in the public schools. Lisa Maura testified that she and her husband have decided that

if they could not afford to send their children to Catholic schools, Lisa would quit her job and

home-school her children, to provide their education, including their religious education.[37]

The Court certainly does not question the Debtors' sincerity, nor their dedication to

obtaining a Catholic education for their children. But even assuming that the Debtors' strong

preference for their children to obtain a Catholic religious education can be considered "special

circumstances" under § 707(b)(2)(B)(i), the Debtors have not met their burden of proving that

"there is no reasonable alternative," by which the Debtors could obtain the reasonable equivalent

of the Catholic religious education without incurring the expense of sending their children to

Catholic schools. First, the evidence established that for all aspects of the Debtors' childrens'

education except the religious aspect, sending the children to the Dearborn Public Schools is

clearly a reasonable alternative to the Catholic schools. Second, with respect to the religious

aspects of their childrens' education, the Debtors have failed to prove that there is no "reasonable

---

[37] *Id.* at 30-32.

alternative" to Catholic schools — for example, sending the children to the tuition-free Dearborn

Public Schools and then home-schooling the children with respect to the religious aspects of the

Catholic education that Debtors want for their children.  Debtors have failed to prove that such

limited home-schooling would require Lisa Maura to quit her job or significantly reduce her

work hours and income.

More fundamentally, the Court concludes that the Debtors' desire to send their children to

Catholic schools, for the religious aspects of a Catholic education, does not qualify as "special

circumstances **that justify additional expenses**. . . for which there is no reasonable alternative,"

within the meaning of § 707(b)(2)(B)(i)(emphasis added).  By claiming $900.00 per month (or

$1,095.00 per month) as a "special circumstance" in this context, the Debtors in effect are asking

for a Chapter 7 discharge of their debts without paying their creditors anything, so that Debtors

can satisfy their strong personal preference to send their children to Catholic schools for a

religious education.  In effect, Debtors want the Court to require their creditors to help fund the

private, religious education of the Debtors' children.  In the Court's view, that cannot be

"justified" under § 707(b)(2)(B)(i).

This conclusion is supported in at least two ways.  First, it is supported by the fact that in

§ 707(b)(2)(A)(ii)(IV), Congress specifically provided for a deduction on the means test form for

public or private elementary or secondary school expenses.  But Congress *limited* that allowable

expense, to a maximum of $1,175.00 per year per child.  This section provides a means test

deduction for the following:

> expenses for each dependent child less than 18 years of age, not to
> exceed $1,775 per year per child, to attend a private or public
> elementary or secondary school if the debtor provides
> documentation of such expenses and a detailed explanation of why
> such expenses are reasonable and necessary, and why such
> expenses are not already accounted for in the National Standards,

> Local Standards, or Other Necessary Expenses referred to in
> subclause (I).

11 U.S.C. § 707(b)(2)(A)(ii)(IV).  This section indicates that Congress intended to provide only a

*limited* amount which Chapter 7 debtors could claim as expenses, for purposes of § 707(b)(2), for

the cost of private education.  And the Debtors in this case have taken full advantage of this

allowable expense, by claiming the maximum allowable expense for their two minor children, on

Line 38 of the Debtors' mean test form, in the amount of $295.84 per month.[38]

Second, the Court agrees with the reasoning of the courts that have held that the expense

of debtors to pay parochial school tuition for their children is not a "reasonably necessary"

expense, for purposes of determining whether a Chapter 13 plan offers to pay creditors all of the

debtors' disposable income.  The reasoning of these cases supports the Court's conclusion here,

that such parochial school expense should not be deemed a "special circumstance that justifies"

an "additional expense for which there is no reasonable alternative," under § 707(b)(2)(B)(i).  *See*

*e.g.*, *In re Watson*, 403 F.3d 1, 8 (1st Cir. 2005); *In re Lynch*, 299 B.R. 776, 779-80 (W.D.N.C.

2003); *In re Schott*, No. 05-49765-293, 2007 WL 914043 at *3 (Bankr. E.D. Mo. March 23,

2007).  In the *Watson* case, for example, the debtor testified much like the Debtors have testified

in this case, that:

> he, his wife, and his two children are devout Catholics who attend
> church every Sunday and during all the holy days of obligation.
> [The Debtor] testified that he is actively involved in church
> ministry, and that his children have been assisting at mass since the
> third grade. [Debtor] stated that he and his wife have always sent
> their children to parochial schools because they value the
> importance such schools place on God.

403 F.3d at 3.  Nonetheless, the United States Court of Appeals for the First Circuit held that the

---

[38]  Docket # 60 at pdf p.5, line 38.

debtors' expense of sending their children to Catholic school for religious reasons was not a

reasonably necessary expense. The *Watson* court reasoned as follows, in that Chapter 13 case:

> To allow the Watsons to pay parochial school tuition over the life
> of the proposed plan would require already severely reduced
> creditors to fund the private education of the Watsons' children.
> We can appreciate the importance attached by the Watsons to the
> religious values of a parochial school education. Still, it is not
> impossible to inculcate those values outside of a school, and the
> court could reasonably conclude, in the circumstances presented
> here, that it would be improper to impose the added expense on the
> Watsons' unpaid creditors where the children's educational needs
> could otherwise be met in the public schools. There was no clear
> error in the bankruptcy court's determination.

403 F.3d at 8.

For these reasons, the Court concludes that the Debtors cannot use any part of their

Catholic school tuition expense to rebut the § 707(b)(2) presumption of abuse in this case.

Based on the foregoing, the Debtors have failed to rebut the presumption of abuse under

§ 707(b)(2).

### 4. Permissive versus mandatory dismissal

Debtors argue that even if they have failed to rebut the presumption of abuse under

§ 707(b)(2), the Court has discretion *not* to dismiss their case. In support of this argument,

Debtors cite the use of the word "may" in § 707(b)(1), and the case of *In re Siler*, 426 B.R. 167

(Bankr. W.D.N.C. 2010).

If the presumption of abuse arises under § 707(b)(2), and is not rebutted, the Court must

"find that the granting of relief would be an abuse of the provisions of [chapter 7]" within the

meaning of § 707(b)(1). But as Debtors point out, the statute (quoted above) merely says that

upon making such a finding, the Court "may" dismiss the case, not that it "shall" or "must" do

so.[39]

The words "may" and "shall" each appear many times in the Bankruptcy Code, but the Code does not explicitly define either word. Nor does the Code state any rules of construction for the word "may."[40] In general, courts construe the word "may" to be permissive, and the word "shall" to be mandatory. *See, e.g.*, *Isle Royale Boaters Ass'n v. Norton*, 330 F.3d 777, 783 n.1 (6th Cir. 2003)("we assume that 'may' is using its 'common-sense' permissive definition unless the context of the statute suggests otherwise")(citation omitted); *Dorris v. Absher*, 179 F.3d 420, 429 (6th Cir. 1999)("The use of the term 'may' in a statute is generally construed as permissive rather than as mandatory.")(citation omitted); *Whitehead v. Richardson*, 446 F.2d 126, 128 (6th Cir. 1971)("may" is permissive; "shall" is mandatory). But the Supreme Court has held that "the mere use of 'may' [in a statute] is not necessarily conclusive of congressional intent to provide for a permissive or discretionary authority." *Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193, 198 (2000) (citations omitted). "It is true that in statutes the word 'may' is sometimes construed as 'shall.' But that is where the context, or the subject-matter, compels such construction." *Farmers' & Merchants Bank of Monroe N.C. v. Fed. Reserve Bank of Richmond*, 262 U.S. 649, 662-63 (1923). The Supreme Court explained it this way in *United States v. Rodgers*, 461 U.S. 677, 706 (1983):

> The word "may," when used in a statute, usually implies some degree of discretion. This common-sense principle of statutory construction is by no means invariable, however, and can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute.

(Footnote and citations omitted).

---

[39] Debtors' Br. (Docket # 72) at 2, 3.

[40] The closest the Bankruptcy Code comes to this is in 11 U.S.C. § 102(4), which states that "in this Title – . . . (4) 'may not' is prohibitive, and not permissive."

Neither the Supreme Court nor the United States Court of Appeals for the Sixth Circuit has addressed this issue in the context of §§ 707(b)(1) and 707(b)(2). The courts that have done so have come to differing conclusions.

Some courts have construed § 707(b)(1) as mandating dismissal or conversion whenever the presumption of abuse arises and is not rebutted. These courts view the word "may" as only giving the court discretion as to which of the options expressly provided in the statute — dismissal or conversion (if the debtor consents to conversion) — is to be ordered. *See, e.g., In re Woodruff*, 416 B.R. 369, 373 (Bankr. D. Mass. 2009)("By explicitly providing in § 707(b)(2)(B)(i) that '[i]n any proceeding brought under this subsection, the presumption of abuse *may only be rebutted* by demonstrating special circumstances,' Congress evinced its intent to divest the bankruptcy courts of the discretion necessary to grant a Chapter 7 discharge to debtors whose case is found abusive under § 707(b)(2)."); *Justice Advanced Control Solutions, Inc.,* No. 07-5231, 2008 WL 4368668, at *1, 5 (W.D. Ark. September 22, 2008)("Indications of legislative intent, and obvious inferences shown to be drawn from the purpose of BAPCPA persuade the court that 'may' in § 707(b) is used to indicate discretion only as far as deciding which two options should be exercised in a case where the presumption of abuse arises and is not rebutted."), *aff'd*, 639 F.3d 838 (8th Cir. 2011); *In re Witek*, 383 B.R. 323 (Bankr. N.D. Ohio 2007)(concluding that court was required to dismiss case due to debtor's failure to rebut presumption of abuse, unless debtor converted case to Chapter 13); *In re Haman*, 366 B.R. 307 (Bankr. D. Del. 2007)(the court "has no discretion and must dismiss the chapter 7 case" if presumption of abuse is not rebutted).

Another line of cases take a more flexible approach. These cases hold that in the face of an unrebutted presumption of abuse under § 707(b)(2), the bankruptcy court has discretion to

deny dismissal, and leave the case in Chapter 7, in unusual cases where that is necessary to avoid an "absurd result." The *Siler* case, cited by Debtors, is one such case, and there are a number of other such cases. *See, e.g.*, *In re Siler*, 426 B.R. 167, 176 (Bankr. W.D.N.C. 2010)(declining to dismiss Chapter 7 case based on a means test presumption of abuse when the debtor could not pay, and could not be required to pay, a dividend to unsecured creditors in a hypothetical chapter 13 case); *In re Mravik*, 399 B.R. 202, 210 (Bankr. E.D. Wis. 2008)(holding that a court "has discretion to deny a motion to dismiss a Chapter 7 case that is presumed abusive under the means test, but would, in complete compliance with Chapter 13, produce no payments to creditors;" court extensively discussed the principle that "may" indicates discretion; the legislative history; and Congressional purpose in enacting BAPCPA); *In re Skvorecz*, 369 B.R. 638, 642 (Bankr. D. Colo. 2007)(plain statutory language of § 707(b)(1) is permissive); *cf. In re Latone*, No. 4:08-bk-0331-EWH, 2008 WL 5049460, at *1-3 (Bankr. D. Ariz. October 23, 2008)(relying on reasoning in *In re Skvorecz* to deny a United States Trustee's motion to dismiss under the "totality of circumstances" test under § 707(b)(3)).

Even those courts that hold § 707(b)(1) to be permissive recognize the narrow scope of their discretion not to dismiss, in the face of an unrebutted presumption of abuse. *In re Mravik*, 399 B.R. at 210 (the exercise of limited discretion under § 707(b)(1) "should be exercised rigorously and sparingly")(quoting *United States v. Rodgers*, 461 U.S. 677, 711 (1983)); *In re Skvorecz*, 369 B.R. at 644 n.12 ("This [c]ourt does not read the 'may' so as to afford a court *carte blanche* discretion to ignore the presumption of abuse and write section 707(b)(2)(A) out of the Code. Rather, the [c]ourt reads it as affording the court discretion in a case such as this, where other provisions of the same statute create an inconsistency leading to an absurd result.").

The Court agrees with the cases, cited above, that conclude that § 707(b)(1) mandates

dismissal or conversion whenever the presumption of abuse arises under § 707(b)(2) and is not

rebutted. As noted above, when there is an unrebutted presumption of abuse under § 707(b)(2),

the bankruptcy court is compelled to "find that the granting of relief would be an abuse of the

provisions of [Chapter 7]" within the meaning of § 707(b)(1). In such a circumstance, the

bankruptcy court's hands are tied. The Court simply cannot make such a finding and then leave a

case to proceed in Chapter 7. That in itself would be an absurd result — finding an abuse but

allowing the abuse to continue.

The Debtors' arguments as to why the Court should exercise its alleged discretion to

decline to dismiss this case, despite the unrebutted presumption of abuse, really amount to a

criticism of the whole § 707(b)(2) means-test concept. Whether such criticism is warranted is

not for this Court to decide; the Court must apply the law that Congress enacted. As the

Supreme Court observed in *Ransom v. FIA Card Servs., N.A.*, 131 S. Ct. 716, 721 (2011), in

responding to the debtor's argument that application of the means test produced an odd result in

that case,

> But this kind of oddity is the inevitable result of a standardized
> formula like the means test, even more under Ransom's reading
> than under ours. Such formulas are by their nature over- and
> under-inclusive. In eliminating the pre-BAPCPA case-by-case
> adjudication of above-median income debtors' expenses, on the
> ground that it leant itself to abuse, Congress chose to tolerate the
> occasional peculiarity that a brighter-line test produces.

## IV. Conclusion

For the reasons stated above, the § 707(b)(2) presumption of abuse arises and Debtors

have not rebutted it. Therefore, the Court must find, and does find, that "the granting of relief

would be an abuse of the provisions of [Chapter 7]" in this case, within the meaning of

§ 707(b)(1). And as a result of this finding, the Court must either dismiss this Chapter 7 case or,

if Debtors wish to convert to Chapter 13 or Chapter 11, permit Debtors to move for such

conversion.[41]  The Court will enter an appropriate order.


**Signed on April 19, 2013**                                        **/s/ Thomas J. Tucker_____**
                                                                    **Thomas J. Tucker**
                                                                    **United States Bankruptcy Judge**

---

[41]  Because the Court has found abuse based on § 707(b)(2), it is not necessary to discuss the UST's alternative argument, that the Court should find abuse based on the § 707(b)(3) "totality of circumstances" test.